Number 15, 1892, Drone Technologies, Inc. Thank you, and may it please the Court. This case arises from an across-the-board default on all infringement issues, all invalidity issues, all unenforceability issues. I want to start by discussing standing, then turn to the disproportionate nature of the sanction of default, which went to issues that had no conceivable relationship whatsoever to the disputed source code that gave rise to the default. And third, then turn to the multimillion-dollar damages at work, which is difficult, if not impossible, to reconcile with this Court's precedence. Standing goes to the Court's jurisdiction, its subject matter jurisdiction. So, Lamkin, on the standing, we have here a, on its face, valid assignee in the person of D.T. Why isn't the approach here just to accept D.T. for purposes of this litigation as an assignee based on the assignment, D.T. as standing in sue, and then, if there's an Your Honor, because an element of standing is having all of the inventors, all of the owners before the Court, when there's a challenge to the ownership before the Court, that has to be addressed. It's a jurisdictional matter, and you cannot default that issue or exclude it and simply accept that the But as of now, D.T. is the owner of the patent, or, I'm sorry, the assignee of the patent. It's the assignee of, purports to have title, but isn't the actual inventor and certainly isn't the sole inventor. And I think Ethicon, in that respect, is illustrative. In Ethicon, the Court held that even for a past damages period, where the plaintiff was the sole assignee of the sole person named on the patent, standing was absent, and standing was absent because the Court later determined that there was another co-inventor, and therefore, that sole assignee of that sole person named on the patent could not sue. For that reason, here, likewise, you may have one named person on the patent, but once that's challenged, once that person's inventorship or right to that patent is challenged, the Court must address the facts, the jurisdictional facts, giving rise to whether or not they indeed hold an enforceable title. What about the other side's argument, that the argument you're pitching would mean that there would be more misinventorship because we would constantly be dismissing those cases for lack of standing? No, I don't think that's true, Judge Shen. For example, in the event you don't name all inventors, but the patent's correctable, you would lack standing, but there would be no invalidity for incorrect inventorship. Conversely, if you name everybody who has these ownership interests in the patent, but the patent's not correctable, standing would be present, but you would hold the invention invalid, because there's incorrect inventorship and it can't be corrected under 256. That actually makes perfect sense in light of the principles and the reasons for the standing rule. The reason this Court requires and the rules require you to name all of the patentees is in part to protect for other patent owners from the adverse consequences that occur. If, for example, the patent's invalidated without their participation. Likewise, it protects the defendant from multiple lawsuits in the event that one of the absent owners then comes forward and tries to get damages as well. And if you prevent people from making this sort of challenge... I guess what I'm wondering is that just in the limited number of cases I've seen, this whole inventorship question's been bound up in a validity question, not a standing question. And so maybe you're better served in raising it as an inventorship question. Right. I think the difficulty is, Your Honor, because the District Court purported to default us on every issue relating to inventorship, that means the issue can come up only as a standing question if that sanction's upheld. But I would agree with you. In many cases, one step that can be taken is you correct the patent, show that there's an omitted inventor, put that omitted inventor on the patent, and then they dismiss for want of standing. But that step the District Court held was not available to us because he defaulted us. And we think that that is just incorrect. Because standing is a jurisdictional question, it goes to the subject matter, the power of the court. The court can't default you on basic questions going to whether or not that person has standing to bring suit. And we think that's supported by Pandraw, for example, where the court said, Yes, absolutely right. The question of ownership was defaulted as a defense on the merits. How would you address this? The motion to dismiss for lack of standing that the judge denied, would you read that judge's decision as saying, I've looked at the records. Ms. Lee has been identified as the inventor of the patent. There's an assignment here to drone technologies. That's all we can do for standing purposes. Or do you think the decision is best read as, I've looked at all of the testimony and evidence about inventorship, and I find that Ms. Lee, in fact, is the inventor. And so therefore, everything else falls neatly into place for drone technology. There's two ways to read his decision. Which one is it to you? Regrettably, my answer is going to be neither. But I think what the District Court said is, it's possible this is really just inventorship. But I think the evidence is sufficient. The evidence is sufficient to show that she is the sole inventor. But what the District Court didn't do is take the next step and say, okay, it's my job as the District Court to make a determination whether she is the sole inventor. And on this record, I make that finding. And frankly, on this record, that's an impossible finding to make. If you line up the claims against the testimony, it's absolutely clear that Ms. Lee cannot be that sole inventor. As I recall, you didn't move for dismissal because the patent's invalid on its face, despite her admission that she didn't know anything about the subject matter. We moved for leave to amend our answer to make exactly that argument. The District Court struck it as part of the sanction. And so, frankly, if the court believes that there's difficulty trying to sort out whether this is inventorship or whether this is standing, that goes away entirely if the court also simply concludes that it was error for the District Court to do an across-the-board default for all questions, including questions that have no relationship whatsoever to the disputed source code that led to the default judgment here. So, Lincoln, you've referred to the default judgment both responding to Judge Newman's question and earlier. How did we get into this big discovery mess? I looked at this. I'm thinking, why didn't the parties kind of try and sit down? It seems the only thing that we're fighting about is this source code. Is this the source code on the controlled device on the drone that's flying around? Exactly. It's the onboard source code, which is the most mission-critical trade secret element that Parrott has. And Parrott did everything it could to hand that over in the way consistent with the way other courts do it with the protections that are necessary to make sure there's no unauthorized access. And that unauthorized access that we're worried about isn't the hypothetical concern. Just last week, the Wall Street Journal reported the Cravath and Wiles servers had been breached. They had been breached by people who are seeking client confidential information. Not in regard to the Wall Street Journal article, which is not in our record, obviously. But I did see you, meaning Parrott, came forward with a proposal for an order which would allow examination of the... Correct me, please, and I'd ask the same question of the other side. Correct me if I misunderstand. As I understand, there was a proposal that the judge denied for an examination of the other circuit or web or anything. Is that correct or am I misunderstanding? That's exactly right. We followed basically the ITC model, which says you can review it on a secure computer in a secure location. You print out relevant pages. Those relevant pages you can then take with you, but they have to be locked up as well. You can't re-digitize them. That request, as I understand it, was... What I saw in the record in the appendix was something that was submitted after the judge had granted this motion to compel following alleged noncompliance with the July 1 order. Is that correct? Yes, Your Honor. Was that proposed earlier also, what was in the order? We proposed it on July 2nd, actually. We asked for clarification that making secure access was an acceptable way of doing it. That motion for clarification was denied. We then made a specific proposal with an actual addendum of the order that's used by the ITC and that we were proposing. In fact, this is also, right now today, precisely the conditions that are used in the court below. The court below now recognizes these conditions are necessary to protect against unauthorized access. I guess at the time, back in July of 2014, was it such an abuse of discretion for the district court judge to follow its own local patent rules? The fact that they have a default protective order that's set up and designed to protect people's interests and he just decided, well, we have this protective order in place in hand. We're just going to follow that. Right. I think it was. I think it was because this is an area where the bar had fallen behind the reality of the dramatic risks that are involved when trade secrets like source code are not given adequate security. The judge had before him example after example after example of other jurisdictions and the approaches they take, jurisdictions that are regularly dealing with these high-tech issues, and the approaches they take to protect source code. I think it's an abuse of discretion to simply say, we have this highly confidential source code, but we won't prevent it from being placed on unsecured thumb drives, unsecured laptops, being emailed to Gmail accounts. We will provide none of those protections. I don't think any government agency in the country, even with moderately confidential data, would permit their employees to treat that data that way. I don't think any district court in the country. You know, it might be tough for us to say that the district court judge was without any discretion to simply use the protective order to protect protected information. But, you know, there's another argument you have, which is that the other side did not meet its burden in its motions to compel for explaining why the source code was so critical for their needs in terms of preparing for infringement contentions and things like that when it came to whether you complied with the requirements for initial disclosures and whether what you had already provided was or was not sufficient to show the operation of the accused devices. I think that's right, Judge Chen. And I think I should be clear that even if it wasn't an abuse of discretion, it's certainly such a sensitive area that protecting its trade secret source code, when it does that, it shouldn't result in an across-the-board default. And it especially couldn't do so when, if you look at the type of balancing the court's supposed to do under Rule 26 and the local rules require, this was not a required production. The local rules said make available for copying or inspection or produce source code, documentation, schematics, or other documents sufficient to show the operation of the accused devices. And there's been no finding at any point in this case that the devices, that the documents we already produced were not sufficient to show the operation of the accused devices. Was that pursued, or I appreciate this is your argument, but was it pursued, was it presented to the district judge that without the source code they would not be able to establish that the patent was infringed? No, I don't think there's any evidence and there's certainly no finding that they couldn't prove infringement without the source code. And in fact, because these are just initial disclosures, the whole point was just to let them make their infringement contentions. This isn't the be-end and end-all of discovery. There's no finding that would be difficult, impossible, or even impede their ability to prove infringement. Mr. Kalu, who was our technical expert from within Parrot, testified that all the materials produced, the designer guidelines, the schematics, the software protocols, etc., were amply sufficient to show the operation of the accused devices. But what the district court's order said was produce all documents relevant to the operation of the accused devices. If I can, at the tail end of your opening argument here, and I'm going to parade my ignorance if I could, can you explain to me, in this case, exactly what source code is and what it does in terms of the controlled drone device? What the source code is is the high-level code, which shows exactly how, with notes from the writers, exactly how this drone operates and how it's responding. That is then compiled and put on devices to make them actually operate. And the compiled code isn't very informative. You can't really use it. The source code, though, is the keys to the kingdom because it shows you exactly how this drone operates. So the source code, for example... That's how it reacts to commands from the person holding the device? Yes, but not just that. How it uses the camera so it doesn't slam into the ground. How it does automatic takeoff, automatic landing. How it responds to changes in wind. How it changes its angle without flipping over. How it does all these amazing things almost instantaneously are all there. So in your view, the source code discloses how, to put it very briefly, the drone flies and operates. It is the value... Is that correct? Everything, yes. Everything. And it is the absolute value of the company is in its software, not in just the ordinary bits of plastic that make up that drone. I see I'm running right into my time. I'm running out of rebuttal. If there are no further questions, I reserve a half-second left for rebuttal. Thank you so much. Good. Thank you. We'll save you rebuttal time, Mr. Thibach. Thank you, Your Honor. May it please the Court. I think the Court has it exactly right in terms of the standing argument. Yu-Tuan Lee is the named inventor of both patents. It was a valid assignment executed and recorded by the USPTO, assigning all rights to drone technologies. Drone technologies is the plaintiff in this case. Well, you do have a difficult problem. On its face, your inventor stated that she was not the inventor. How do you overcome that? With all due respect, Your Honor, she did not say she was the inventor. In every instance she was asked, she said she was the inventor. So she had no understanding of how the device worked, and yet this major argument here now is the provision of the source code. And yet the inventor has stated under oath that she doesn't understand any of this. What the inventor said under oath, Your Honor, was when presented with English-language copies of the documents, not Chinese-language copies of the documents, she said she couldn't talk about, she didn't understand, she couldn't explain the technical aspects of the invention. Now, where are the technical aspects? Where is the source code in the patent? This demand for the source code for infringement requires some kind of correlation, does it not, between what is disclosed in claim and the evolution of proof of infringement? It's very simple, Your Honor. In both patents there's one independent claim and the rest are dependent claims. Now, one independent claim is structured in two pieces. It's a remote control system having one piece, which is the remote controller, which is the iPhone that controls the remote control device, and the second piece is the remote control device. In each of those sections, the way that the independent claim is structured, there are signals that are created, signals that are sent, signals that are responded to. But those signals are not in the specification. I'm trying to understand the need for the source code when there is no disclosure of source code in the patent. Well, the source code was for the infringing device, Your Honor. That was for us to be able to... But I'm trying to understand you. In order to demonstrate infringement,  Exactly. In most of the cases that we see, there is the specification, the disclosure, where each function is described with a box around it, and it is then shown that the accused device performs the function. Correct, Your Honor. By observation not of how the electrons move within the computer chip, but the overt performance. So I'm trying to understand why the source code is a necessary element of proof of infringement. Well, let me give an example, Your Honor. There's a claim element referred to as target motion signal. The target motion signal is originally created in the remote controller based on the motion of the remote controller, and then it's sent up to the remote control device. And in the remote control device, that target motion signal is acted upon within the device. That's what controls the drone, as Mr. Lemkin described. What we had was the source code at the remote controller side, but once that signal was sent up to the remote control device, they said, you can't see that. We're not going to tell you, we're not going to show you, we're not going to explain any of that. We'll just assume that whatever you say about that is fine. I don't understand why that's a necessary element of the proof based on the disclosure in your specification. I'm sorry, I didn't hear the question, Your Honor. I don't understand it, and it is unusual for the computer codes, for the coding system, for the minutia of the operation to be included in the specification and to be involved in the proof. And the requirement for provision of the source code and why that is necessary in order to establish that the functions, when all that's in the specification is a general statement of the functions, what the relationship is between these two, such that it is so essential that a default judgment is appropriate. Well, Your Honor, as I explained, we were inquiring about their source code so that our technical expert could analyze what the accused devices do once the various signals are received by the remote control device. And why wouldn't block diagrams be good enough? I mean, I guess what we're hearing from the other side is they produced a lot, a lot of pages of technical documents, including flow diagrams and things like that on how the drone operates as well as how the remote control operates. Why do you actually need to go all the way into the nitty-gritty and see all of their source code? That's the question. Because, frankly, Your Honor, our technical experts ask for it. We don't direct them. We don't tell them what conclusion we want them to reach. They ask for the information that they feel they need to perform the analysis. And I guess the next question is, for your motion to compel, isn't the burden on you to explain why you needed the source code beyond just having whatever technical documents they had given you at that point? Well, I think in our first motion to compel, Your Honor, we made the showing that what they provided, A, was not adequate, and, B, it was not up to them to decide what was sufficient to show and what was not. And I think the district court reviewed that record and reviewed those arguments and made that finding. Well, what was it that you said in your first motion to compel that said you needed the on-board source code? Well, we didn't talk specifically about the on-board source code in the first motion to compel. We were talking about the general documents that are required under local patent rule. We were talking about the Free Flight software app, the source code for that, which you ultimately got. Right, and that was one piece. That's when I was responding to Judge Newman's question. That was the piece about the signals getting sent up to the remote-controlled device. What happened once they got up to the remote-controlled device? We didn't have that information because Parrot wasn't willing to provide it. Would you say that processing module, driving module, acceleration sensing module, as claimed, are means-plus-function limitations? I would not say that they're means-plus-function limitations, Your Honor. So are you saying driving module is a specific structure? I would say it was a specific structure. Is there any software involved in a driving module? There could be. It could be implemented in hardware or software, a combination of both hardware and software. Do you need to disclose that in the specification? Well, if it's not known in the prior art, that would be correct. But actually we have admissions by Parrot here. They filed two IPRs with PTAB, and in the IPR related to the 748 patent, they said that every element is disclosed except for the configuration control switch. That was the only thing that was missing from the prior art reference that they used. With regard to the 071 patent, they said it was anticipated by two different references. You can't raise indefinite misrejections in an IPR. Is that right? That's correct, Your Honor. Mr. Dubaczyk, picking up on the discussion I had with Mr. Lampkin, he said that, number one, there was an offer to view what's required in connection with the source code on a freestanding computer where information couldn't be sent beyond that device. And then I did see there was something like that in certain of the paragraphs that were appended in the appendix here in connection with a document that was filed after the motion to compel was granted. Why was that not enough? Assume for the moment everything you say about meeting the source code is correct, what your expert said, why is it not a reasonable compromise to say, okay, you can view it in this way? Your Honor, it was virtually two months after we had initially requested or should have received the initial disclosure documents that they made that offer. I was fortunate to have been involved at the district court level with the case, so I'm much more familiar with the record. So what you're saying is the first time this offer was made is in that paper that was filed seeking a protective order following the motion to compel, is that what you're saying? Exactly, Your Honor. August 1st, 2014 at appendix page numbers 914 through 1020. As early as July 3rd, 2014, though, they did offer to make their onboard source code available for inspection, right? Which would be the other piece of local patent rule 3.1, either produce the source code or make available for inspection. Right, and this was after the district court had ordered them to produce it. So once they lost the motion, then they said, okay, well, how about if we don't follow the court's order and we figure something else out? And it was a result of those discussions. They had very strict limitations that were, frankly, going to encumber our expert and encumber us in preparing our case, having to fly to Houston to look at the source code, having to arrange three days in advance for them to do it, not be able to do what the experts wanted to do with it, which was sort of simulate what goes on with the software and things like that because we would have to do it in opposing counsel's offices under their watchful eyes. If we were to conclude that your June 19 motion to compel didn't sufficiently explain why you needed all of the source code and we also didn't see the court's July 1 order explaining the reason for why it was going to grant you access to all the source code, then what should we do with that? Is that a grounds for vacating the order? I don't think so, Your Honor. I think this court has a long history of respecting district court's decisions in terms of discovery rules, in terms of interpreting their local rules, in terms of managing their cases, and, frankly, if this court is inclined to send it back saying that the district court got it wrong, that it abused its discretion, then I have a feeling this court's docket is going to be very full with reviewing discovery orders, whether it be through writs of mandamus, as Herod tried to do 12 weeks after the fact, or on appeal after the entry of the sanction. The courts have their respective roles. Remind me, what had been agreed in terms of protecting the proprietary nature of the source code? What had been agreed to was to follow the court's standard protective order that both parties had agreed to at the initial case management conference. But that was before the onboard code had been placed into issue, was that right? I'm sorry, Your Honor, I didn't hear. The protective order had been agreed was a standard protective order based on your initial request for protection. It had been agreed to before. I mean, frankly, the counsel is from outside the Western District of Pennsylvania. They were admitted pro hoc vici, and as part of their admission, they had to say that they read, understood the local rules, and agreed to apply them, including the protective order. That was before you had asked for the second installment of source code, is that correct? Well, I mean, you say it's a second installment, but the local patent rule 3.1 says source code. It doesn't talk about onboard source code versus remote controller source code. But it also qualifies the source code. It says to the extent necessary or appropriate. And here we have an issue of whether the entire volume of volumes of source code meet that definition. Well, frankly, Your Honor, the issue is whether we get the source code on the remote control device. If we get to see what happens to those signals once they're received by the remote control device, Parrott decided that was what was sufficient to show, which is the language in local patent rule 3.1. We just need to see the source code in the remote controller. We don't need to know what happens in the remote control device. And that was their position with the initial motion to compel. The court ruled against them. Two days later, they filed an emergency motion for reconsideration, making the same arguments. The court ruled against them again. They subsequently said, we're going to comply. We have or will imminently comply with the court's order. And then they didn't, which necessitated time. They persisted in continuing to propose offering to make it available for inspection. They never said, yes, we are going to provide the onboard source code. They never said that. They said, yes, they are planning on complying with this order by July 9 or by the following date. But they always proposed a clarification of the order to please allow them to control access of the onboard source code. Respectfully, I disagree, Your Honor. They made no distinction after the first order compelling the production. They said they had complied or will imminently comply with the order. That was just before the second motion to compel, the motion to compel. Right, the July 3 emergency motion. But in that July 3 emergency motion, they also said they were willing to make available their onboard source code through making it available for inspection. So that was how they were looking to try to work with and comply with the July 1 order. And the district court rejected that argument. The district court ordered them to produce. That is right. But I guess my point is that you were saying that they were blanketly saying they were going to comply with the order and they didn't. That's not exactly true. They were always looking to try to preserve the protections around their onboard source code. Respectfully, I disagree, Your Honor, because they made the argument in the emergency motion for reconsideration. The court rejected it a second time after the initial motion. And then they said we have produced or will imminently produce documents required to comply with the order. They didn't say except for the source code, which would still stand by our original argument. They also didn't file a petition for writ of mandamus at that point, which, you know, would have been appropriate. But this was just sort of the process they went through. They were changing positions. They were offering. Let's assume that I don't agree that they kept changing their positions. Let's also assume that I still don't understand why you need the onboard source code at the opening act of discovery, initial disclosures. This isn't the beginning, middle, and end of the play. This is the opening act of the play. So why did you need the onboard source code for developing your infringement contentions when you already had 14 million pages of initial disclosure? Well, first of all, our infringement contentions were due June 20th. So we needed it right away. Second of all, the 14 million pages of documents didn't come until two months later. There were 2,700 pages of documents that they had produced in terms of the initial disclosure. And virtually all of that is stuff that came off their website or publicly available information. There was nothing that was contemplated by Rule 3.1. Any sort of internal documents, technical documents, flow charts, diagrams, or source code. In addition, Your Honor, this isn't about source code and wasn't only about source code. There were two models of accused devices, Bebop and Minidrome. They refused to produce any documents. Forget about source code. They refused to produce any documents. Are those products listed in the complaint? They weren't listed in the complaint, but they were expressly part of the district court's order. But perhaps that was based on a misreading of the local patent rule, which talks about providing initial disclosure sufficient to show the operation of accused devices listed in the complaint. Right now, at least with respect to those two devices, they're not in the complaint. The local patent rules have been in place in the Western District of Pennsylvania since 2009. Judge Schwab is one of the patent judges in the pilot program that the Western District of Pennsylvania is participating in. It is certainly within this court's power to say that Judge Schwab got it wrong. But under an appropriate protective order, and this is certainly part of the entire debate, is it not, in terms of protecting this extraordinarily valuable asset for the owner of it, and as to how much of that needs to be placed publicly available and how it's to be protected, just seems to underlie this entire discussion. Well, Your Honor, this protective order in essentially its form has been in place since 2009. But how you administer a protective order for source code is critical. They have offered to make it available for observation in an environment in which it can't be transmitted and copied, and that's been refused, apparently. Well, it was refused in the context in which it was offered, which is two months later after the court had twice ordered PARA to produce it. And so here we are arguing about it when it might have been resolved in that two-month period? It might have been resolved, except the restrictions were too egregious. They prevented us as lawyers and our technical experts from doing the job they needed to do with the source code. It was as if they weren't giving it to us at all. We would have to sit there and read it on a screen, ask permission to print portions of it. Our experts wouldn't be able to use the source code to follow the signals, to practice or simulate. What happens in a lot of other district courts, including the ITC, though? Making the source code available on a standalone computer connected to a server, and then the opposing counsel goes in there and reviews the source code. I mean, that's not that unusual. And so it's not clear to me why, given the pervasiveness of that practice, it's all of a sudden so burdensome in this particular instance. Well, in the five or six years that the district court has had its local patent rules and the protective order applying to patent cases in place, apparently this has never been an issue and it's never been a problem. So there was no need to do it until Parrott came along and said, we're going to make this as expensive and as difficult for the plaintiff as possible. We're going to make them fight for every piece of discovery. We're not going to give anything. Parrott's head of legal sat in the witness box six feet away from the bench and told the district judge, I understand the order, I know what I'm supposed to do, I know that there are consequences for not complying, and I'm still going to ignore the order. She said that to the district court. And she said, and we're not going to do this until we're forced to do it by the federal circuit. At that point they had filed a petition for written mandamus. This court subsequently denied the petition. We never saw any source code. We never saw it under any circumstances. You know, frankly, from my perspective, these offers were teases. They weren't legitimate offers. They were teases in terms of dragging this out because their hope was the IPRs were going to run their course and that they were going to be successful in the IPRs. And if they could simply drag out the district court proceedings and make them cumbersome and expensive for the plaintiff, that they would win. And it didn't work out that way. They lost the IPRs. And the district court. Does that answer your question? Yeah. Okay. Thank you. Thank you, Your Honor. Let's see, Mr. Lankin. Restore your rebuttal. Plus add the time that we have overrun. Let's make it eight minutes. Thank you, Mr. Lankin. Thank you, Judge Romano. If I could start very briefly with respect to standing. The district court effectively gave two sentences of evaluation. That's simply not enough. In terms of what the supposed inventor knew, it is very clear on the record, if you look at each of the limitations, she did not understand what they were, didn't understand the modules, didn't understand the signals. I know that counsel now says, well, there was a language difficulty. There was no claim of language difficulty below. We had two interpreters, an interpreter and a Czech interpreter. Neither said there was a difficulty of language. She had the Chinese patents before her by that time. And, in fact, the one thing she didn't understand wasn't the questions. She never said, I don't understand the questions. What she didn't understand was the technology she supposedly invented. And that was true of all the other patents that she supposedly invented while her husband was there. If we're going to make this about inventorship, it doesn't seem like there was a proper, I don't know, discovery process on the inventorship question. You did get a shot at deposing Ms. Lee and Mr. Ding, but it doesn't seem like there was a full evaluation of the inventorship question through a customary discovery process. Well, Your Honor, I think nobody's objected that the record is incomplete. And the record is, frankly, quite clear that it cannot be that Ms. Lee is the sole inventor of this item when she does not understand  what the signals are, when it's comprised of modules that communicate to each other with signals. This record is absolutely clear on that. But I think I might be belaboring that point a little bit because I would probably prefer to switch very quickly to standing because that could ease, excuse me, sanctions, because that could ease whether or not we have an issue of inventorship here or whether it's really an issue of standing. And turning to sanctions, even if the district court didn't abuse its discretion in requiring us to turn over unsecured copies of our confidential source code. And we think it was an abuse of discretion because I just can't imagine any other district court anywhere in the country ordering Apple or any other high-tech company to turn over its confidential source code with no protection against it being emailed, no protection against it being put on unsecured thumb drives, no protection on it being put against unsecured laptops. I just can't imagine that happening. It's outside the box. But even if we're wrong, even if this at least is an issue that points out that the cross-the-board sanction of default simply goes too far. Let me ask you, how soon after the request was made for source code, in other words, source code specifically identified as being requested, how soon after that, well, first of all, when was that, number one? And number two, how soon after that did Parrott come forward with its proposal for an examination on a freestanding computer? Right. So, Your Honor, I think... Stand-alone computer. Yeah, so the first inkling we had that the district court was ordering us to turn over unencrypted copies of the source code was when it issued its July 1 motion to compel. But had there been a request for it before, from the others, from DT? No, the entire focus up to that point was on the controller source code, which was public source, and the focus was on that because we had gone through different changes. We had actually pulled out the allegedly infringing functionality from the controller for a period of time, and they wanted to see how that was done and try to determine the importance of that. But that was all turned over. The moment it went to the on-board source code, by July 3rd we were asking for clarification from the district court. You're saying the first time it, quote, went to on-board source code as an issue was on July 1 when the motion to compel was filed? No, when the district court ruled. The district court ruled. It was in the order. It suddenly said produce all source code, and we filed a motion two days later. Emergency motion, clarification, reconsideration. It hadn't been mentioned by Drone Technology before that? Not to my knowledge. Well, to be fair, the June 19th motion to compel was asking for source code. It was spotlighting the FreeFlight software app, but it wasn't limited to just the FreeFlight software. Judge Shen, if we had known, if we had been aware that they were really after the on-board source code, the best thing for us to do would be to run it immediately and say, and this is easy for me to say with the appellate 20-20 hindsight, which is not necessarily fair to trial counsel, but run and say we can't produce that without protections. We will not produce that without protections. If the district court is inclined to order us to do so, please impose an immediate repealable sanction, and let's take this up to the Court of Appeals. But no one saw that coming, frankly, and no one is really interested in engaging in that kind of brinksmanship, which isn't necessary. What we tried to do is we tried to make it available on different term after different term that would produce its security, but meet their objections. So, for example, the first stop we offered to make it available on the same terms as the ITC. That wasn't good enough. So we offered to make it available on a secure relativity database where they could review the source code on screen in their own offices without any monitoring for us. That wasn't good enough. We offered two months before the contempt hearing, two months before the contempt hearing, to stipulate that we practice every single limitation of the onboard vehicle, taking that issue completely off the table. That's not the conduct of someone who's trying to obstruct the process. That's the conduct of someone who's trying to protect their source code and trying to move things along. But the answer we got in each instance was no, no, no, no. We also were never told, why do you need that source code? Why isn't everything we gave you in these initial disclosures not good enough to get you past that initial point? And that's the last two points I want to make is, look, this is about initial disclosures. We barely got out of the box on this case. In 60 days, from the first motion to compel around June 19th to the motion for contempt, which resulted in default in August 18th, in 60 days, this court case took a complete U-turn from the merits to a sanction across the board. And it seems that under the circumstances, the one thing that seems clear is that across the board, default on issues that have no relationship whatsoever to the disputed source code. So, for example, controller limitations. For example, invalidity. For example, unenforceability. Those issues which have no connection to the disputed source code. Making those the subject of default just simply goes too far. If the court does not have any further questions, I'd be happy to... What would happen, theoretically, if we vacated everything? Discovery order, the sanctions order, the damages verdict. But maybe the district court would have a second opportunity to explain why it believed that your initial disclosures were not enough to comply with Rule 3.1. Certainly the district court might have that opportunity. The ordinary rule, since it's an abuse of discretion standard, the district court makes that decision in the first instance. I think given the tenor of what we've got, the very likely result is we will get the maximum sanction possible. And therefore, I think it would be very helpful if this court were to articulate the outer boundaries and the circumstances as to what it thinks is appropriate. But I should make clear, though, that even in the district court below, its new local rules provide exactly the protections we are asking for. And one of the provisions of those new local rules say, when you're before the court, the parties are going to have to now sit down and discuss whether these new local rules and these new protective orders should apply. And that's at the very minimum one of the things that we think should have happened on remand is we should have a chance to go back and apply the new local rules, which do what the ITC did, what we're proposing, what the Northern District of California does, what virtually every district does. What has happened, if you know, in the district court in other cases, given the advent of these new local rules? Are ongoing cases adopting them or going with the old rule? I don't know how people are handling these local rules. All I know is that they apply to new cases, and parties who have ongoing cases have to discuss, they have to meet and confer on whether they apply. And they provide exactly what Parrott was asking for all along. Certainly under those circumstances, certainly under those circumstances, we should restore the truth-finding function of the trial here and reverse the sanctions, remand this case for full consideration of the merits. To the extent the district court thinks the sanctions are still appropriate, it will have another chance at it. And we also ask that the court respectfully consider the possibility, the possibility of remanding the case for consideration before a district court judge. And I make that request very gingerly, because it's a sensitive topic. In 25 years, I've never made that suggestion. So if the court believes that it's in the interest of justice, in the interest of the judicial system, in the interest of the appearance of impartiality, we would at least ask the court to consider it. Thank you.  Thank you. Thank you, Mr. Levkin. Mr. DeGrasse Tyson. The case is taken into submission.